UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                :

JOHN CLARIZIA, *et. al.*, individually and on    :
behalf of all others similarly situated,          :

                                :      Case No. 13-cv-02907-ALC-HBP

             Plaintiffs,         :

                                :

         - v -            :

                                :

OCWEN FINANCIAL CORPORATION, et al.,    :

             Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS ASSURANT, INC. AND AMERICAN SECURITY INSURANCE COMPANY'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants Assurant, Inc. and American Security Insurance Company (collectively, the "Assurant Defendants") respectfully request that the Court take notice of two recent decisions dismissing multistate class allegations for lack of subject-matter jurisdiction, one from the United States District for the District of Minnesota, *Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, No. 13 Civ. 2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014), and the other from the United States District Court for the Eastern District of California, *Morales v. Unilever United States, Inc.*, No. 13 Civ. 2213, 2014 WL 1389613 (E.D. Cal. Apr. 9, 2014). For the Court's convenience, copies of these decisions are attached as Exhibits A and B.

Following the approach taken in *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litigation*, MDL No. 2451, 2014 WL 868827 (E.D.N.Y. Mar. 5, 2014), and *Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389 (W.D. Pa. 2014), and the numerous other decisions highlighted in Assurant Defendants' prior briefing, the *Insulate SB* and *Morales* courts each held that named plaintiffs in a putative class action lack Article III standing to assert claims under the laws of states in which they do not reside or in which they suffered no injury. *See Insulate SB*, 2014 WL

943224, at *11; *Morales*, 2014 WL 1389613, at *4.  The *Insulate SB* and *Morales* courts each

further held that evaluation of named plaintiffs' Article III standing to assert multistate class

allegations should not be deferred until the class certification stage.  *See Insulate SB*, 2014 WL

943224, at *11; *Morales*, 2014 WL 1389613, at *5-6.  The *Insulate SB* court specifically

declined to follow the approach taken in *In re Grand Theft Auto Video Game Consumer*

*Litigation*, No. 06 Civ. 1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006), and *In re Buspirone*

*Patent Litigation*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002), two decisions relied upon by plaintiffs

herein.  *See* 2014 WL 943224, at *10-11.

This supplemental authority supports arguments made at pages 12-16 of the Assurant

Defendants' motion to dismiss (Dkt. No. 63) and pages 6-9 of the reply thereto (Dkt. No. 80).

<table>
<tr><td>Dated: New York, New York<br>May 2, 2014</td><td>/s/ Andrew T. Solomon<br>Andrew T. Solomon<br>Karen E. Abravanel<br>SULLIVAN & WORCESTER LLP<br>1633 Broadway, 32nd Floor<br>New York, New York 10019<br>Telephone: (212) 660-3000<br>Facsimile: (212) 660-3001<br>asolomon@sandw.com<br>kabravanel@sandw.com</td></tr>
</table>

Franklin G. Burt (*pro hac vice*)
W. Glenn Merten (*pro hac vice*)
Brian P. Perryman (*pro hac vice*)
CARLTON FIELDS JORDEN BURT
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile: (202) 965-8104
fburt@cfjblaw.com
gmerten@cfjblaw.com
bperryman@cfjblaw.com

*Attorneys for Defendants Assurant, Inc.*
*and American Security Insurance Company*

# Exhibit A

2014 WL 943224

United States District Court,
D. Minnesota.

INSULATE SB, INC., Plaintiff,

v.

ADVANCED FINISHING SYSTEMS, INC.;
Airtech Spray Systems; Barnhardt Manufacturing
Company; C.H. Reed, Inc.; C.J. Spray Inc.; Coast
Industrial Systems, Inc.; Coatings Holdings,
Ltd.; Demilec (USA), LLC; Dove Equipment Co.,
Inc.; Endisys Fluid Delivery Systems; Golden
State Paint Corporation; Graco, Inc.; Graco
Minnesota, Inc.; Jack De Mita; Intech Equipment
& Supply, LLC; Marco Group International,
Inc. (Marco); MCC Equipment & Service
Center; Specialty Products, Inc.; Spray Foam
Nation (registered under Energy Independence
Inc.); Spray Foam Systems, LLC; Spray–Quip,
Inc.; and Ultimate Linings, Ltd., Defendants.

Civil No. 13–2664 ADM/
SER.  |  Signed March 11, 2014.

## Attorneys and Law Firms

Christopher A. Nedeau, Esq., Veronica L. Harris, Esq., and
Natasha Saggar Sheth, Esq., Nossaman LLP, San Francisco,
CA, and Richard A. Lockridge, Esq., Karen H. Riebel, Esq.,
and Eric N. Linsk, Esq., Lockridge Grindal Nauen P.L.L.P.,
Minneapolis, MN, on behalf of Plaintiff Insulate SB, Inc.

Stephen P. Safranski, Esq., Anne M. Lockner, Esq., Kellie
Lerner, Esq., George D. Carroll, Esq., and Mahesha P.
Subbaraman, Esq., Robins Kaplan, Miller & Ciresi, LLP,
Minneapolis, MN, on behalf of Defendants Graco Inc., and
Graco Minnesota, Inc.

Lewis A. Remele, Jr., Esq., and Christopher R. Morris,
Esq., Bassford Remele P.A., Minneapolis, MN, on behalf of
Defendants Advanced Finishing Systems, Inc.; Airtech Spray
Systems; C.H. Reed, Inc.; C.J. Spray Inc.; Coast Industrial
Systems, Inc.; Coatings Holdings, Ltd.; Demilec (USA),
LLC; Engineered Distribution Specialties, LLC (identified in
the Complaint as Endisys Fluid Delivery Systems); Golden
State Paint Corp.; Intech Equipment & Supply, LLC; Marco
Group International, Inc.; MCC Equipment & Service Center;
Specialty Products, Inc.; Spray Foam Systems, LLC; Spray–
Quip, Inc.; and Ultimate Linings, Ltd.

Elizabeth M. Sorenson Brotten, Esq., Foley & Mansfield,
PLLP, Minneapolis, MN; and Jeanne Welch Sopher,
Esq., and Kevin M. Ward, Esq., Rawle & Henderson
LLP, Pittsburgh, PA, on behalf of Defendant Barnhardt
Manufacturing Company.

Barry A. O'Neil, Esq., Lommen, Abdo, Cole, King &
Stageberg, PA, Minneapolis, MN; and L. Pahl Zinn, Esq.,
Dickinson Wright PLLC, Detroit, MI, on behalf of Defendant
Spray Foam Nation.

Opinion

## MEMORANDUM OPINION AND ORDER

ANN D. MONTGOMERY, District Judge.

## I. INTRODUCTION

**\*1** On December 17, 2013, the undersigned United States
District Judge heard oral argument on Defendants Graco, Inc.
and Graco Minnesota, Inc.'s (collectively "Graco") Motion
to Dismiss [Docket No. 211] and Motion to Stay Discovery
[Docket No. 232], Distributor Defendants' Motions to
Dismiss [Docket Nos. 224 and 241], [1] and Plaintiff Insulate
SB, Inc.'s ("Insulate") Motion for Expedited Discovery
[Docket No. 254]. For the reasons set forth below, Graco and
the Distributor Defendants' motions to dismiss are granted
and the parties' discovery motions are denied as moot.

## II. BACKGROUND [2]

This is a putative antitrust class action against Graco, a
manufacturer of fast-set equipment used to install foam
insulation, and against dozens of Graco's alleged distributors
(the "Distributor Defendants"). [3] Insulate alleges Graco
acquired two of its closest competitors in the fast-set
equipment market to gain significant market share and
eliminate competition, which allowed Graco to raise the
prices of its fast-set equipment products and reduce product
options after the acquisitions. Compl. [Docket No. 1] ¶¶
156, 160–61. Insulate also alleges Graco and the Distributor
Defendants conspired with each other to exclude new entrants
into the fast-set equipment market by entering into exclusivity
agreements, boycotting competing products, vertically fixing

prices, and controlling geographic distribution areas. *Id.* ¶¶ 9–10, 95–96, 104–05, 110–12, 171. Claiming violations of federal and state antitrust laws and state consumer protection statutes, Insulate seeks damages and injunctive relief on behalf of end users who purchased fast-set equipment from Graco or one of its Distributors during the Class Period. [4] *Id.* ¶¶ 1, 187, 198–283.

## A. The Parties

Graco is incorporated in Minnesota and manufactures fast-set equipment. *Id.* ¶¶ 4, 38. Fast-set equipment includes spray guns, heated hoses, and other components, and is used primarily by contractors to install spray foam insulation in residential and commercial buildings. *Id.* ¶¶ 4, 56–58. The sale of fast-set equipment to end users occurs almost exclusively through specialized distributors who act as intermediaries between the manufacturer and contractors. *Id.* ¶ 63. The Distributor Defendants sold fast-set equipment during the Class Period. *Id.* ¶¶ 21–37, 39–52. Insulate is a fast-set contractor incorporated in California. *Id.* ¶ 20. Insulate purchased fast-set equipment from Distributor Defendant Intech Equipment & Supply, LLC, an Arizona corporation. *Id.* ¶¶ 20, 41. Insulate alleges it was force to pay higher prices as a result of the Defendants' conduct. *Id.* ¶ 20.

## B. Graco's 2005 and 2008 Acquisitions of Fast–Set Equipment Manufacturers

In February of 2005, Graco purchased Gusmer Corporation ("Gusmer"), the world's largest manufacturer of fast-set equipment, from PMC Global, Inc. ("PMC") for $65 million. *Id.* ¶¶ 148–49. Following the acquisition, Graco closed Gusmer's fast-set equipment manufacturing facilities. *Id.* ¶ 151. Graco's acquisition of Gusmer caused the Gusmer line of products to become obsolete. *Id.* ¶ 160. "This forced buyers, many begrudgingly, to switch to the more expensive corresponding Graco models." *Id.* ¶ 161.

**\*2** In February of 2008, Graco purchased GlasCraft, the only other competing manufacturer of fast-set equipment, for $35 million. *Id* . ¶¶ 152, 155. Following the GlasCraft acquisition, Graco closed GlasCraft's fast-set equipment manufacturing facilities. *Id.* ¶ 151.

## C. Defendants' Alleged Conspiracies to Boycott and Exclude Competition

The Complaint alleges "[u]pon information and belief" that after acquiring Gusmer in 2005, Graco agreed with each

of its Distributors to exclude new entrants from the fast-set equipment market. *Id.* ¶ 104. The Complaint further alleges that, "[u]pon information and belief, the Distributors collectively agreed to and conspire [sic] with one another to exclude new entrants" from the fast-set equipment market. *Id.* ¶ 105. This allegation is based on the theory that "[t]he Distributors were economically motivated to join and enforce the conspiracy to exclude new entrants in the [fast-set equipment] market, because the conspiracy enabled Distributors to: charge Contractors anticompetitive prices for fast-set equipment, and control geographic distribution areas and exclude new distributors from such areas, who might be willing to sell new entrants' products." *Id.* ¶ 112.

## D. PMC and Former Gusmer Employees' 2007 Reentry Into Market; Graco's Reaffirmation of Boycott

In 2007, former owners and employees of Gusmer, operating through PMC, Garraf Maquinaria S.A. ("Garraf"), and Gama Machinery USA, Inc. ("Gama") sought to reenter the fast-set equipment market. *Id.* ¶ 99. Graco allegedly viewed Gama and PMC as a threat to its monopoly power in the fast-set equipment market, and sought the advice of unidentified "key Distributors" to determine "how best to reinforce the Distributors' individual and collective agreements" to exclude new entrants from the market. *Id.* ¶ 102, 114. Following this alleged consultation, Graco sent a letter to Distributors in October 2007 (the "October 2007 Letter"). The Complaint avers the October 2007 Letter was a reminder to Distributors of the consequences that would befall them if they did not continue to abide by their exclusivity agreements with Graco. *Id.* ¶ 115. The October 2007 Letter stated in relevant part:

> It is our opinion that taking on an additional competitive product line may significantly reduce the "best efforts" of a Graco distributor to sell our Graco and Gusmer product lines. Graco realizes that a business owner must make independent decisions regarding product lines competitive to Graco and Gusmer product offerings. Graco makes similar independent business decisions regarding the addition of new distributors in a given geographic area.

> Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement. If you are considering adding a Graco or Gusmer competitive equipment offering to your business, we ask that you give careful thought prior to making your final decision.

**\*3** This position has been adopted by us unilaterally.

*Id.; Graco Inc. v. PMC Global, Inc.,* Civ. No. 08–1304 (D.N.J.) at Gama Countercl. [D.N.J. Docket No. 23] Ex. 2.

**E. Graco's 2008 Litigation with PMC, Garaf, and Gama**
In March of 2008, Graco filed a federal lawsuit in New Jersey against PMC, Garraf, and Gama alleging theft of trade secrets and breach of contract. *Id.* ¶ 101, *Graco Inc. v. PMC Global, Inc .,* Civ. No. 08–1304 (D.N.J.) at Compl. ("Graco Compl.") [D.N.J. Docket No. 1]. Graco alleged that PMC and the former Gusmer employees working with PMC unfairly exploited Gusmer intellectual property and goodwill that had been sold to Graco. Graco Compl. ¶¶ 47, 58–86. On June 30, 2008, Gama responded to Graco's Complaint and asserted antitrust counterclaims (the "Gama Counterclaim") against Graco. Gama alleged a scheme by Graco to exclude competition in the fast-set market, and also accused Graco of exclusive dealing, monopolization, and conspiracy to monopolize. Gama Countercl. ¶¶ 1, 3. Gama attached the October 2007 Letter as an exhibit to its publicly-filed Counterclaim. *Id.* Ex. 2.

**F. FTC's 2013 Complaint, Consent Decree, and Order**
After the litigation in New Jersey began, the Federal Trade Commission ("FTC") initiated an investigation of Graco's alleged anticompetitive conduct. *See Matter of Graco, Inc.,* http://www.ftc.gov/os/caselist/1010215/index.shtm. On April 17, 2013, the FTC filed a complaint against Graco, alleging Graco violated antitrust laws by acquiring Gusmer and GlasCraft, raising prices for fast-set equipment products, reducing product options, and raising barriers to market entry for manufacturers seeking to compete with Graco. Compl. ¶ 6. On the same day the FTC filed the complaint against Graco, the FTC entered into a Consent Agreement with Graco. *Id.* ¶ 8. The FTC also issued a Decision and Order ("FTC Order") that remains effective until April 17, 2023 and requires Graco "to cease and desist from inviting, entering into, and implementing exclusivity policies with its distributors." *Id .*

Simultaneously, Graco entered into a settlement agreement to resolve the litigation with PMC, Gama and others. *Matter of Graco,* http://www.ftc.gov/ sites/default/files/documents/ cases/2013/04/130418gracodo.pdf at 5. The settlement was incorporated into the FTC Order and requires PMC to purchase licenses from Graco for PMC's use of the Gusmer

intellectual property that Graco acquired in 2005. *Id.* at 4, App. C.

Insulate alleges it did not discover Graco and the Distributor Defendants' anticompetetive and conspiratorial conduct until the FTC filed its complaint against Graco in April 2013. Compl. ¶ 176.

**G. Insulate's June 2013 Complaint Against Graco and Distributors**
On June 14, 2013, Insulate filed this antitrust lawsuit against Graco and 32 of its alleged distributors. The Complaint alleges Graco and the Distributor Defendants violated Section 1 of the Sherman Act by entering into a vertical retail price-fixing and market allocation conspiracy (Count I) and by using exclusionary contracts and other conduct to eliminate and bar new market entrants (Count II). The Complaint also alleges Graco violated Section 2 of the Sherman Act by monopolizing the fast-set equipment market (Count III), and that all Defendants violated this provision by conspiring to acquire, maintain, and enhance Graco's monopoly power (Count IV). The Complaint further alleges all Defendants violated Section 3 of the Clayton Act by using exclusionary contracts to substantially lessen competition (Count V), and that Graco violated Section 7 of the Clayton Act by unlawfully acquiring Gusmer and GlasCraft (Count VI). Finally, the Complaint asserts claims against all Defendants under 22 state antitrust laws and Puerto Rico's antitrust law (Count VII), and under 11 state consumer protection laws (Count VIII). Insulate seeks damages, treble damages, and injunctive relief. The requested injunctive relief proposes: (1) prohibiting Defendants from continuing to exclusively deal with one another; (2) requiring Distributors to sell 25% non-Graco fast-set equipment; and (3) divesting Graco of its fast-set equipment business.

**\*4** Graco and the Distributor Defendants move for dismissal of the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Graco also moves to stay discovery, and Insulate moves to expedite discovery.

**III. DISCUSSION**

**A. Motion to Dismiss Standard**
Rule 12 of the Federal Rules of Civil Procedure states that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P.

12(b)(6). The court construes the pleadings in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *Hamm,* 15 F.3d at 112.

Working in combination with Rule 8, Rule 12 requires the plaintiff's factual allegations to "raise a right to relief above the speculative level," and push claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007). In other words, the complaint must establish more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). However, a court "must not presume the truth of legal conclusions couched as factual allegations," and should "dismiss complaints based on 'labels and conclusions, and a formulaic recitation of the elements of a cause of action.' " *Hager v. Ark. Dept. of Health,* 735 F.3d 1009, 1013 (8th Cir.2013) (quoting, in part, *Twombly,* 550 U.S. at 555); *see also Retro TV Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 769 (8th Cir.2012) ("Conclusory statements and naked assertion[s] devoid of further factual enhancement are insufficient.") (quotations and alterations omitted).

In ruling on a motion to dismiss, a district court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999) (internal quotations and citations omitted); *see also Stahl v. U.S. Dep't of Agric.,* 327 F.3d 697, 700 (8th Cir.2003) (stating a court may consider public records and matters referenced in the complaint in ruling on a motion to dismiss).

**B. Federal Anti-trust Claims**

**1. Statute of Limitations**
Graco and the Distributor Defendants seek dismissal of the federal antitrust claims, arguing inter alia that the claims for damages under the Sherman Act and Clayton Act are time-barred. "Federal antitrust causes of action are governed by a four-year limitations period." *Varner v. Peterson Farms,* 371 F.3d 1011, 1019 (8th Cir.2004) (citing 15 U.S.C. § 15b). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's

business." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971).

**\*5** Defendants argue the acts that allegedly injured Insulate's business—thereby causing Insulate's claims to accrue and the limitations period to commence—were committed before June 14, 2009, which is four years before Insulate's filing of the Complaint on June 14, 2013. Specifically, Defendants' entry into vertical price-fixing and market allocation conspiracies, as alleged in Count I, began "at least as early as 2005." Compl. ¶ 199. Defendants' entry into exclusionary contracts or agreements, as alleged in Counts II, and V, occurred sometime prior to October of 2007, because Graco's alleged purpose in sending the October 2007 Letter was to "remind" Distributors of the consequences of not abiding by the agreements. Compl. ¶ 115. Graco's monopolization of the fast-set equipment market, as alleged in Count III, occurred when Graco acquired Gusmer and GlasCraft in 2005 and 2008, respectively. *Id.* ¶¶ 148–56. The conspiracy among all Defendants to maintain Graco's monopoly power, as alleged in Count IV, began before Gama attempted to reenter the fast-set equipment market in 2007. *Id.* ¶ 223. Defendants thus contend the limitations period has expired and the claims must be dismissed.

Insulate argues the federal anti-trust claims are not time-barred because 1) the limitations period was tolled under the fraudulent concealment doctrine, and 2) the limitations period was restarted under the continuing violations doctrine.

**a. Fraudulent Concealment**
The fraudulent concealment doctrine applies if a plaintiff proves that (1) a defendant concealed the plaintiff's cause of action, (2) the plaintiff failed to discover the action, and (3) the plaintiff exercised due diligence in attempting to discover the claim. *In re Milk Prods. Antitrust Litig.,* 84 F.Supp.2d 1016, 1022 (D.Minn.1997). If these elements are met, "the limitation period begins to run from the time that the plaintiff, by the exercise of reasonable diligence, discovers or should have discovered his cause of action." *In re Bulk Popcorn Antitrust Litig.,* No. 3–89–0710, 1990 WL 123753, at \*5 (D. Minn. June 19, 1990). Insulate argues Defendants prevented it from learning of the antitrust conspiracy until the FTC filed its litigation in April of 2013, and so the limitations period did not begin to run until that time.

Assuming without deciding that the first two elements of the fraudulent concealment doctrine are met, Insulate cannot prove that it exercised diligence in attempting to discover the

antitrust conspiracy. A plaintiff who becomes aware of facts and activities that would "create notice and excite attention" requires inquiry on the part of the plaintiff. *Milk Prods.,* 84 F.Supp.2d at 1024. When prices are raised and competition is substantially eliminated, "[t]his fact alone would seem to excite attention and thus put [a] Plaintiff [ ] on inquiry notice." *Id.* Here, Insulate was aware of facts sufficient to excite its attention and put it on notice of its potential antitrust claims. After Graco acquired Gusmer in 2005, Gusmer products became obsolete, prices for fast-set equipment increased, and choices for fast-set equipment declined. These facts would have drawn Insulate's attention when it became forced to "begrudgingly" switch to more expensive fast-set equipment models. Compl. ¶ 161; *see also In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1171 (8th Cir.1979) ("Those who have learned of facts calculated to excite inquiry must inquire.") (quotations omitted).

 **\*6** Moreover, just as the FTC litigation put Insulate on notice of its claims in April 2013, the New Jersey litigation should have put Insulate on notice of its claims when Gama filed its Counterclaim against Graco in June of 2008. "The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice" if the litigation uncovers information that would tend to verify a plaintiff's allegations or suspicions. *Beef Indus.,* 600 F.2d at 1171. The circumstances of the New Jersey litigation sufficed to give Insulate notice of its claims back in June 2008, because the October 2007 Letter on which Insulate heavily relies to support its present claims was attached as an exhibit to Gama's publicly-filed Counterclaim. Thus, the New Jersey litigation that occurred five years before this case was filed uncovered information that would tend to verify Insulate's allegations or suspicions.

For these reasons, Insulate did not exercise due diligence in attempting to discover its antitrust claims, and the doctrine of fraudulent concealment does not apply.

### b. Continuing Violation Doctrine

Insulate next argues the federal antitrust claims are not time-barred because the statute of limitations was restarted by the continuing violation doctrine. The continuing violation doctrine provides that each overt act that is part of a violation and that injures the plaintiff starts the statutory period running again. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189 (1997). An overt act is required to restart the statute of limitations, and the limitations period runs from the date of the last overt act. *Varner,* 371 F.3d at 1019.

The elements of an overt act are: (1) a "new and independent act that is not merely a reaffirmation of a previous act," and (2) the infliction of new and accumulating injury on the plaintiff. *Id.* To qualify as a continuing violation, the new overt act "must be more than the unabated inertial consequences of the initial violation." *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.,* 392 F.3d 265, 269 (8th Cir.2004). Additionally, "acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1052 (8th Cir.2000) (quotation omitted).

Insulate contends that Defendants' continued adherence to the conspiracy to boycott constituted continuing violations. However, if there was a conspiracy, Defendants' continued compliance would merely reflected the unabated inertial consequences of the Defendants' alleged agreements to exclude new entrants to the fast-set equipment market. These agreements are alleged to have been reached at least as early as 2007, and Insulate has not alleged that new acts were required to maintain the unlawful arrangements. Indeed, according to the Complaint, "the threat of loss of a distributorship [was] sufficient to hold the conspiracy together." Compl. ¶ 168; *see also id.* ¶ 241 (alleging Graco's status as the sole supplier of fast-set equipment has enabled Graco "to prevent its distributors from withdrawing from the conspiracy").

 **\*7** Insulate contends a February 2012 letter from Graco to Distributors "reminding them" they were not to carry the Gama product line was an overt act in furtherance of the conspiracy that started the limitations period running anew. However, the first element of an overt act expressly states that a "reaffirmation of a previous act" cannot constitute an overt act. The February 2012 letter merely reflected and reaffirmed the alleged prior agreement to eliminate new entrants such as Gama from the fast-set equipment market, and therefore did not restart the limitations period. [5]

Insulate further argues that Defendants committed an overt act each time a supra-competitive price was changed in furtherance of the price-fixing conspiracy. The analysis of whether sales at supra-competitive prices constitute a continuing violation differs depending on whether the claim is brought under the Clayton Act or the Sherman Act. With respect to a claim under Section 7 of the Clayton Act, which forbids acquisitions that substantially lessen

competition or tend to create a monopoly, the Eighth Circuit has held that post-merger sales at higher prices are not continuing violations because "such acts [are] not undertaken to further an illegal policy of merger or to maintain the merger." *Midwestern Mach.*, 392 F.3d at 271 (holding increased hub premiums charged post-merger were "not continuing violations of the Clayton Act sufficient to restart the statute of limitations"); *see also Concord Boat*, 207 F.3d at 1052 (refusing to apply continuing violation doctrine where defendant's conduct was an "unabated inertial consequence" of the initial acquisition).

With regard to the Sherman Act, the Eighth Circuit has observed that an "antitrust continuing violation occurs in a price-fixing conspiracy, actionable under Section 1 of the Sherman Act ... when conspirators continue to meet to fine-tune their cartel agreement. These meetings are overt acts that begin a new statute of limitations because they serve to further the objectives of the conspiracy." *Midwestern Mach.*, 392 F.3d at 269 (internal citation omitted). The Complaint does not include any factual allegation that the Distributor Defendants met or communicated for the purpose of "fine-tuning" or furthering the objectives of their alleged price-fixing conspiracy. Although the Complaint alleges that unidentified "key Distributors, as well as other FSE Distributors, know and communicate with each other at industry conferences and otherwise," *id.* ¶ 108, no information is provided about the conferences, who attended them, or what was discussed.

Additionally, a customer's injury resulting from a price-fixing agreement occurs when the defendants begin to charge supra-competitive prices. *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F.Supp.2d 1079, 1088–89 (D.Minn.2010). "Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them." II Phillip Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 320c4 (3d ed.2007). Where a defendant's continued sales under an anticompetitive arrangement merely enforces the initial, unabated arrangement, the sales do not constitute a continuing violation. *Compare Varner*, 371 F.3d at 1020 (holding continued sales under alleged anti-competitive contracts did not restart limitations period because plaintiffs "failed to allege any new overt acts, other than enforcement of the initial contracts," that would toll the statute of limitations) *with Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 588 (8th Cir.1987) (discussing Third Circuit's opinion in *Hanover Shoe, Inc. v. United*

*Mach. Corp.*, 377 F.2d 776, 794 (3d Cir.1967), *rev'd in part*, 392 U.S. 481 (1968), and noting that defendant's conduct in *Hanover* went beyond mere continuation of lease-only policy because defendant entered into new leases when old machinery was no longer working and actively collected rentals from coerced lessees). The Complaint does not allege facts suggesting the initial price-fixing agreement was abated or that new acts beyond the initial price-fixing were required to perpetuate the agreement. Therefore, as with the alleged boycott conspiracy, the alleged price-fixing conspiracy does not constitute a continuing violation, and Insulate's federal antitrust claims are time-barred.

### 2. Failure to State Claims

**\*8** Even if the claims alleging price-fixing, market allocation, and exclusionary agreements in Counts I—V were to survive the statute of limitations challenge, the claims must nevertheless be dismissed because the Complaint fails to allege sufficient facts to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The claim of a "vertical retail price-fixing agreement and conspiracy," alleged in Count I, rests on the conclusory statement that "Graco with each of the Distributors individually and collectively agreed to vertically fix the price of fast-set equipment," Compl. ¶ 171, and on the naked assertion that "[t]he Distributors were economically motivated to join and enforce the conspiracy to exclude new entrants in the FSE market, because the conspiracy enabled Distributors to: charge Contractors anticompetitive prices for fast-set equipment, and control geographic distribution areas and exclude new distributors from such areas, who might be willing to sell new entrants' products." *Id.* ¶ 112. The Complaint has no factual allegations identifying which Distributors charged anticompetitive prices and which Distributors controlled which geographic areas, much less conduct or communications suggesting concerted or conspiratorial action by Distributor Defendants. Thus, the bare allegations of a price-fixing conspiracy are too vague to put the Defendants on notice of the factual grounds for this claim. *See Milk Prods.*, 84 F.Supp.2d at 1020 (dismissing price-fixing claim based on vague allegations that defendant engaged in illegal pricing discussions with other defendants and unnamed co-conspirators by phone and in person, illegally allocated customers, and illegally enforced compliance with conspiracy).

The claim that Defendants conspired to eliminate new entrants to the fast-set equipment market through the use of exclusionary contracts, as alleged in Counts II, IV, and V,

also fails to state a plausible claim for relief. An exclusionary practice is not an exclusionary contract or conspiracy if the practice is "merely a unilateral or independent decision." *Quality Mercury, Inc. v. Ford Motor Co.,* 542 F.2d 466, 469 (8th Cir.1976). Here, the Complaint fails to allege facts showing more than unilateral action by Graco. Although the Complaint conclusorily alleges the Distributor Defendants conspired with Graco and each other by entering into exclusivity arrangements with Graco, the October 2007 Letter referenced in the Complaint explicitly stated that Graco had "unilaterally adopted" its exclusivity policy, and that each Distributor "must make independent decisions regarding product lines competitive to Graco and Gusmer product offerings." Additionally, given Graco's ultimatum, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly,* 550 U.S. at 566. Indeed, the Complaint as much as acknowledges that each of the Distributor Defendants had an independent and individual self-interest in acquiescing to Graco's demands for exclusivity: "Incumbent distributors cannot afford to take on a new competitive product line, if they risk the loss of access to Graco's products, and new entrants cannot compensate the distributors to make such a switch." Compl. ¶ 113. The Complaint specifically recounts an instance in which a Distributor acquiesced to Graco's exclusivity policy because acquiescence was "a better decision for [the Distributor's] business." *Id.* ¶ 128. The Complaint also states that Graco's "agree[ment]" with Defendant Distributors "reduced Distributors' willingness and *ability* to carry the products of new entrants." *Id.* ¶ 95. In other words, Distributor Defendants could not carry new entrants' products even if they wanted to.

**\*9** In sum, Insulate's claims for damages under the federal antitrust laws accrued more than four years ago, and the fraudulent concealment and continuing violation doctrines do not apply to prevent the claims from being time-barred. Therefore, the claims for damages in Counts I–V are dismissed based on the statute of limitations. Additionally, to the extent they are not time-barred, the claims involving price-fixing, market allocation, and exclusivity conspiracies and agreements in Counts I–V are dismissed based on Insulate's failure to allege sufficient facts to push the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

### 3. Injunctive Relief

Insulate also requests injunctive relief on its federal antitrust claims. Insulate seeks an order prohibiting Graco and

Distributors from continuing to deal exclusively with one another, requiring Distributors to sell 25% non-Graco fast-set equipment, and divesting Graco of its fast-set business.

Each of the three requested equitable remedies fails as a matter of law. First, Insulate's request to prohibit Graco and Distributors from continuing to deal exclusively with one another lacks merit because it duplicates the FTC Order prohibiting Graco from continuing its exclusive-dealing practices. Second, the request for a sales quota is not a reasonable remedy because "[c]ourts are ill suited to act as central planners, identifying the proper price, quantity, and other terms of dealing. No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 452–53 (2009) (quotations and internal citations omitted).

Third, equitable principles bar the claim for divestiture. Divestiture is the "most drastic" of antitrust remedies. *Ginsburg v. InBev NV/SA,* 623 F.3d 1229, 1234 (8th Cir.2010). "Never has a federal court ordered divestiture at the request of a private party who was neither a customer nor a competitor of the merging parties." *Id.* In determining whether to impose the extreme remedy of divestiture, courts balance the potential benefit to the plaintiff against the hardship caused by forced divestiture. *Id.* at 1235. For example, in *Ginsburg,* the Eighth Circuit determined divestiture was barred as a matter of law because the challenged acquisition had occurred nearly two years earlier, and the assets and operations of the merged corporations had already been combined. *Id.* at 1235–36. The Eighth Circuit ruled that the obvious hardship that would result from a court decree splitting up the merged entities outweighed the potential benefits end users would gain from divestiture. *Id.* Similarly here, the potential benefit to end-users of fast-set equipment would be outweighed by the hardship that would result from divesting Graco of its fast-set equipment business. Graco's acquisition occurred over five years ago, and divestiture would impose obvious hardship on Graco employees and Distributors. Therefore, Insulate's claims for equitable relief in Counts I–VI are dismissed.

### C. State Law Claims

**\*10** Defendants argue that Insulate lacks standing to assert claims for alleged violations of state, other than California, antitrust and consumer-protection laws, because Insulate does not reside in those states and has not alleged suffering injury in those states. Insulate responds that the standing

issue is premature because no class has yet been certified. Insulate argues class-certification issues must be decided before consideration of Article III standing.

"It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.,* Civ. No. 10–5943(DRD), 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011) (citing *Lewis v. Casey,* 518 U.S. 343, 357 (1996). However, courts differ over the question of

> whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rule of Civil Procedure 23.

*Magnesium Oxide,* 2011 WL 5008090, at *8; *see also In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 654–58 (E.D.Mich.2011) (noting federal court split and surveying cases); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.,* Civ. No. 12–169, 2013 WL 5503308, at *11 (D.N.J. Oct. 2, 2013) (same).

The split among courts stems from the two Supreme Court cases of *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999). Both cases concern global settlements of class actions, address the standing of absent class members (rather than named plaintiffs), and involve situations in which the court was simultaneously presented with class certification issues and Article III issues. *Magnesium Oxide,* 2011 WL 5008090, at *9–10; *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 153–55 (E.D.Pa. July 30, 2009). In each case, the Supreme Court resolved class certification issues prior to resolving Article III standing, because the class certification issues were dispositive in those cases and thus were 'logically antecedent to the existence of Article III issues....' " *Ductile Iron,* 2013 WL 5503308, at *12 (quoting *Amchem,* 521 U.S. at 591–92).

Some courts interpret *Amchem* and *Ortiz* as requiring a court to defer Article III standing issues until after class

certification. *See In re Grand Theft Auto Video Game Consumer Litig.,* No. 06–1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002).

Other courts read *Amchem* and *Ortiz* more narrowly, interpreting the cases to

> stand [only] for the proposition that, in cases where a court is presented with class certification and Article III standing issues *simultaneously,* and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are 'logically antecedent' to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint.

**\*11** *Ductile Iron,* 2013 WL 5503308, at *12 (quoting *Magnesium Oxide,* 2011 WL 5008090, at *10) (alteration in original). Courts adopting this more limited interpretation require a named plaintiff to establish standing for each claim set forth in a class action when the issue is presented prior to class certification. *See, e.g., Ductile Iron,* 2013 WL 5503308, at *11 ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."); *In re Graphics Processing Units Antitrust Litig.,* 527 F.Supp.2d 1011, 1026–27 (N.D.Cal.2007) (stating "standing can be addressed before class certification" and dismissing claims under antitrust laws of states in which no named plaintiff resided; *cf. Chin v. Gen. Mills, Inc.,* Civil No. 12–2150 (MJD/TNL), 2013 WL 2420455, *3 (D. Minn. June 3, 2013) (granting Rule 12 motion to dismiss certain claims in a putative class action and noting that "other courts routinely dismiss claims in consumer class actions that attempt to seek relief relating to products that the named plaintiffs have not purchased").[6] Were a named plaintiff not required to establish Article III standing for each class action presented, "named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, [would be allowed] to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *Wellbutrin,* 260 F.R.D. at 155. This Court finds this reasoning persuasive

and dismisses those claims for which Insulate cannot establish Article III standing.

"[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Ductile Iron,* 2013 WL 5503308, at *11. Insulate is a resident of California, and has not alleged that it suffered injury in any other state. Additionally, Insulate has not identified any specific state in which wrongful conduct occurred that may be causally connected to Insulate's injury. Thus, Insulate lacks standing to assert any of the state law claims alleged in Counts VII and VIII of the Complaint with the possible exception of the California antitrust claim, Cal. Bus. & Prof.Code §§ 16700 *et seq.,* alleged in Count VII, and the claim that Defendants violated California's prohibition against unfair competition or unfair or deceptive acts or practices under Cal. Bus. Prof.Code §§ 17200 *et seq.,* alleged in Count VIII.

Furthermore, California's antitrust statute is subject to a four-year statute of limitations. Cal. Bus. & Prof.Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued."). Thus, this claim is time-barred for the same reasons as the federal antitrust claims. *See Oliver v. 3D–3C, LLC,* No. C 11–01260 JSW, 2012 WL 1835740, at *3 (N.D.Cal. May 21, 2012) (finding plaintiff's antitrust claims under California law fell "outside the statute of limitations period for all of the same reasons applicable to its federal antitrust claims"). Therefore, Count VII is dismissed in its entirety.

 **\*12** The claim in Count VIII for violation of the California Business and Professions Code § 17200 must also be dismissed. "An action based on Section 17200 'borrows' violations of other laws and treats them as unlawful practices." *Id.,* at *4. Insulate has failed to adequately allege a violation under any other law, and thus has also failed to state a claim under § 17200. *See id.* ("Because the Court has concluded that Plaintiffs have failed to state a claim under any independent law, the Court similarly finds that Plaintiffs have failed to state a claim under Section 17200

for unlawful business practices and dismisses the claim."). Therefore, Count VIII is dismissed in its entirety.

Because Insulate has failed to allege any plausible claims for relief, this lawsuit is dismissed as to all Defendants. [7]

**D. Discovery Motions**
The parties' discovery motions are rendered moot by the dismissal of all claims in this action. Therefore, the discovery motions are denied.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Defendants Graco, Inc. and Graco Minnesota, Inc.'s Motion to Dismiss [Docket No. 211 ] is **GRANTED;**

2. Distributor Defendants' Motion to Dismiss [Docket No. 224] is **GRANTED;**

3. Defendant Spray Foam Nation's Motion to Dismiss [Docket No. 241] is **GRANTED;**

4. Defendant Graco, Inc. and Graco Minnesota, Inc.'s Motion to Stay Discovery [Docket No. 232] is **DENIED;** and

5. Plaintiff Insulate SB, Inc.'s Motion for Expedited Discovery [Docket No. 254] is **DENIED.**

6. All claims in Plaintiff Insulate SB, Inc.'s Complaint are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**Parallel Citations**

2014-1 Trade Cases P 78,705

Footnotes

[1]     The "Distributor Defendants" are all of the named defendants except Graco, Inc. and Graco Minnesota, Inc. The Distributor Defendants joining in the Motions to Dismiss are: Advanced Finishing Systems, Inc.; Airtech Spray Systems; Barnhardt Manufacturing Company; C.H. Reed, Inc.; C.J. Spray Inc.; Coast Industrial, Inc.; Coatings Holdings, Ltd.; Demilec (USA), LLC; Engineered Distribution Specialties, LLC (incorrectly identified in the Complaint as Endisys Fluid Delivery Systems); Golden State Paint Corp.; Intech Equipment & Supply, LLC; Marco Group International, Inc.; MCC Equipment & Service Center; Specialty

Products, Inc.; Spray Foam Nation (registered under Energy Independence Inc.); Spray Foam Systems, LLC; Spray–Quip, Inc.; and Ultimate Linings, Ltd.

2   In considering the Motions to Dismiss, the Court takes the facts alleged in the Complaint to be true. *See Hamm v. Groose,* 15 F.3d 110, 112 (8th Cir.1994).

3   Insulate initially named thirty-three distributors as defendants, but voluntarily dismissed twelve of them shortly after this case was transferred from Pennsylvania to Minnesota. *See* Notices of Voluntary Dismissal [Docket Nos. 200–210, 218].

4   The Class Period runs from "February 1, 2005, until the effects of the anticompetitive conduct end." *Id.* ¶ 187.

5   Insulate also argues that Graco instructed pro se Defendant Distributor Jack De Mita in August 2009 that he was not to support sub-distributors that also distributed the Gama product line, and that this communication by Graco was an overt act that started the limitations period anew. Pl.'s Mem. Opp. Graco Mot. Dism. [Docket No. 249] at 12. However, the August 2009 communication, which is neither mentioned in nor embraced by the pleadings, is a matter outside the record here and may not be properly considered by the Court. Moreover, even if this communication were considered, it is also a reflection and reaffirmation of the alleged prior refusal to deal.

6   The parties have not cited, nor has this Court located, any Eighth Circuit Court of Appeals decision on this issue.

7   Distributor Defendants Dove Equipment Co. and Jack De Mita did not file a motion to dismiss or join in the motions to dismiss by the other Distributor Defendants. However, the Complaint does not allege any basis to differentiate the claims asserted against them from the motion to dismiss of the other Defendants. Therefore, the claims against these additional Defendants are also dismissed based on Insulate's failure to allege plausible claims for relief.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B



Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.

Alba MORALES and Lanie Cohen, on behalf of
themselves and all others similarly situated, Plaintiffs,
v.
UNILEVER UNITED STATES, INC., Defendant.

Civ. No. 2:13–2213 WBS EFB.
Signed April 9, 2014.

Mark P. Kindall, Nicole Anne Veno, PHV, Izard
Nobel, LLP, West Hartford, CT, Alan R. Plutzik,
Bramson Plutzik Mahl & Birkhaeuser, LLP, Walnut
Creek, CA, for Plaintiffs.

James Maxwell Cooper, Michael Phillip Esser, Kirk-
land & Ellis LLP, San Francisco, CA, Jay P.
Lefkowitz, Phv, Ross Weiner, PHV, Kirkland & Ellis
LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER RE: MOTION TO
DISMISS*
WILLIAM B. SHUBB, District Judge.

**\*1** Plaintiffs Alba Morales and Lanie Cohen
brought this putative class-action lawsuit against de-
fendant Unilever United States, Inc., in which they
allege that defendant misled them and similarly situ-
ated consumers by falsely representing that its
TRESemmé Naturals line of hair care products con-
tained no synthetic chemicals or artificial ingredients.
Defendant now moves to dismiss the First Amended
Complaint ("FAC") pursuant to Federal Rule of Civil
Procedure 12(b)(1) for lack of standing and Federal
Rule of Civil Procedure 12(b)(6) for failure to state a
claim upon which relief can be granted.

*I. Factual & Procedural History*

Defendant is a major cosmetics company that
produces, among other products, the TRESemmé
Naturals line of shampoos and conditioners. (FAC *1* 1
(Docket No. 1).) Morales is a resident of South Lake
Tahoe, California. (*Id.* ¶ 6.) Morales alleges that she
purchased defendant's Nourishing Moisture shampoo,
Nourishing Moisture conditioner, Vibrantly Smooth
shampoo, and Vibrantly Smooth conditioner at a
Safeway store in South Lake Tahoe, California in June
2012. (*Id.*) Cohen is a resident of Canton, Massachu-
setts. (*Id.* ¶ 7.) Cohen alleges that she purchased de-
fendant's Radiant Volume shampoo and Vibrantly
Smooth conditioner at a Target store in Stoughton,
Massachusetts in April 2013. (*Id.*) Both plaintiffs
allege that they viewed the product labels before
purchasing the products and paid a premium for the
products over comparable products not marketed as
"natural." (*Id.* ¶¶ 6–7, 17.) Plaintiffs allege that de-
fendant's representation that the products are natural is
false because the products contain numerous "unnat-
ural synthetic ingredients." (*Id.* ¶ 16.)

On October 22, 2013, plaintiffs brought this ac-
tion on behalf of themselves, a putative class of pur-
chasers located in twenty-one states including Cali-
fornia and Massachusetts (the "Class"), a subclass of
California purchasers (the "California subclass"), and
a subclass of Massachusetts purchasers (the "Massa-
chusetts Subclass"). Plaintiffs assert three claims: (1) a
claim by Morales under the Unfair Competition Law
("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.,* on
behalf of the California Subclass; (2) a claim by Mo-
rales under the Consumers Legal Remedies Act
("CLRA"), Cal. Civ.Code § 1750 *et seq.,* and twenty
other state consumer protection statutes [FN1] on behalf
of the Class and the California Subclass; and (3) a
claim by Cohen under the Massachusetts Consumer
Protection Act ("MCPA"), Mass. Gen. Laws. Ann. ch.
93A, and twenty other state consumer protection

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

statutes on behalf of the Class and the Massachusetts Subclass. Defendant now moves to dismiss the complaint pursuant to Rule 12(b)(1) for lack of standing and pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

> FN1. Those statutes were enacted by the District of Columbia and the following twenty states: Alaska; Arkansas; California; Connecticut; Delaware; Florida; Hawaii; Illinois; Maine; Massachusetts; Michigan; Missouri; Nebraska; New Hampshire; New Jersey; New York; Rhode Island; Vermont; Washington; and Wisconsin. Each of plaintiffs' class-wide claims arises under the same grouping of state consumer protection statutes.

## II. *Standing*

### A. *Article III and Statutory Standing*

"An Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the 'case or controversy' requirement of Article III of the U.S. Constitution." *Brazil v. Dole Food Co.,* 935 F.Supp.2d 947, 960 (N.D.Cal.2013) (citing *Clapper v. Amnesty Int'l,* ––––U.S. ––––, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013)). "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper,* 133 S.Ct. at 1147 (internal quotation marks omitted). A plaintiff invoking federal jurisdiction must satisfy the standing requirements of Article III even if she asserts only state-law claims. *Birdsong v. Apple, Inc.,* 590 F.3d 955, 960 n. 4 (9th Cir.2009).

**\*2** In addition to the requirements set forth by Article III, a plaintiff asserting claims under California's consumer protection statutes must also establish statutory standing. To have standing to sue under the

UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as an injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 322, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) (emphasis in original).

The standing requirements under the UCL are both similar to and "substantially narrower than federal standing under [A]rticle III ... which may be predicated on a broader range of injuries." *Id.* at 324, 120 Cal.Rptr.3d 741, 246 P.3d 877. The standing requirements under the UCL are also more stringent than those imposed by the CLRA, which requires only that a plaintiff have suffered "any damage" as a result of the defendant's misconduct. Cal. Civ.Code § 1780(a); *see also Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1108 (9th Cir.2013) ("[A]ny plaintiff who has standing under the UCL's ... 'lost money or property' requirement will, *a fortiori,* have suffered 'any damage' for purposes of establishing CLRA standing." (emphasis in original)); *Meyer v. Sprint Spectrum L.P.,* 45 Cal.4th 634, 641–43, 88 Cal.Rptr.3d 859, 200 P.3d 295 (2009) (discussing standing requirements under CLRA). Therefore, if plaintiffs have sufficiently alleged standing under the UCL, they have also alleged standing under the CLRA and Article III.

### 1. *Economic Injury*

A plaintiff must establish that he suffered "some form of economic injury" in order to have standing under the UCL. *Kwikset,* 51 Cal.4th at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. "An economic injury exists where a seller misrepresents a product and, had the product been represented accurately, buyers would not have been willing to pay as much as they did, or would have refused to purchase the product altogether." *Rosales v. FitFlop USA, LLC,* 882 F.Supp.2d 1168, 1174 (S.D.Cal.2012).

Here, plaintiffs allege that they suffered economic

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

injury because they paid a premium for TRESemmé Naturals products over comparable products that are not marketed as "natural." (FAC ¶ 17.) The "extra money paid" for these products above what plaintiffs would have paid but for defendant's allegedly deceptive representations constitutes economic injury. *Kwikset,* 51 Cal.4th at 330, 120 Cal.Rptr.3d 741, 246 P.3d 877; *see also Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 595 (9th Cir.2012) (holding that plaintiffs' allegations that "class members paid more ... than they otherwise would have paid ... because Honda made deceptive claims" sufficiently alleged economic injury). Even if plaintiffs have not alleged what they would have paid absent defendant's alleged misrepresentations that the products were free from artificial ingredients, they are not required to do so in order to allege economic injury under the UCL. *See Hinojos,* 718 F.3d at 1105 (noting that the UCL does not require a plaintiff "to plead how much he would have paid for the merchandise had he known its true value"). Accordingly, plaintiffs have sufficiently alleged that they suffered economic injury as a result of defendant's misrepresentations. *See Kwikset,* 51 Cal.4th at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877.

2. *Causation*

**\*3** In order to have standing under the UCL, a plaintiff must allege not only that he suffered economic injury, but also that there was a "causal connection" between that injury and the defendant's alleged misrepresentation. *Kwikset,* 51 Cal.4th at 326, 120 Cal.Rptr.3d 741, 246 P.3d 877. Because "reliance is the causal mechanism of fraud," a plaintiff "proceeding on a claim of misrepresentation must demonstrate actual reliance on the allegedly deceptive or misleading statements" in order to have standing under the UCL. *In re Tobacco II Cases,* 46 Cal.4th 298, 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009).[FN2]

> FN2. This requirement also applies to claims brought under the "unlawful" prong of the UCL if "the predicate unlawful conduct is based on misrepresentations," as is allegedly

the case here. *Durell v. Sharp Healthcare,* 183 Cal.App.4th 1350, 1363, 108 Cal.Rptr.3d 682 (4th Dist.2010).

The California Supreme Court has recognized that a presumption of actual reliance arises whenever a misrepresentation is material—that is, if a reasonable person would "attach importance to its existence or nonexistence in determining his choice of action." *Id.* As a result, a plaintiff "need only allege a misrepresentation of a material fact" in order "[t]o satisfy the requirement of pleading actual reliance, or causation, in connection with false advertising for purposes of the UCL." *Chapman v. Skype Inc.,* 220 Cal.App.4th 217, 229, 162 Cal.Rptr.3d 864 (2d Dist.2013). "The materiality of a misrepresentation is generally a question of fact unless the misrepresentation was so obviously unimportant that the trier of fact could not reasonably conclude that a reasonable person would have been influenced by it." *Id.*

Here, plaintiffs allege that they "viewed the labels" and "paid a premium for those products over comparable products that do not purport to be natural." (FAC ¶¶ 6–7, 17.) Those allegations permit the reasonable inference that plaintiffs purchased the products on the basis of representations made on the label. *See In Re Tobacco II Cases,* 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20. Although defendant contends that plaintiffs have not identified the specific aspect of the product labels that influenced their decision to purchase the products, plaintiffs are not required to do so in order to establish standing.[FN3] *See Kwikset,* 51 Cal.4th at 328, 120 Cal.Rptr.3d 741, 246 P.3d 877 ("While a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct."). Rather, a plaintiff need only allege that defendant's misrepresentations were a "substantial factor" in influencing her decision to purchase the product. *Engalla v. Permanente Med. Grp.,* 15

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

Cal.4th 951, 977, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997). Plaintiffs have alleged that defendant's representations were a substantial factor in their decision to purchase the product-so much so, in fact, that plaintiffs paid a significant premium over comparable products not marketed as natural. (*See* FAC ¶ 17 (comparing cost of TRESemme Naturals products and comparable TRESemme products on Drugstore.com).)

> FN3. Defendant's contention that plaintiffs must identify the particular aspect of the labeling they relied on is particularly inappropriate where, as plaintiffs allege, the labeling of the TRESemmé Naturals products was part of a larger advertising campaign that emphasized the products' "natural" qualities. *See In re Tobacco II Cases,* 46 Cal.4th at 328, 93 Cal.Rptr.3d 559, 207 P.3d 20 ("[W]here, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements.").

Even if defendant were correct that plaintiffs have not alleged that they relied upon any particular representation or aspect of the product label, plaintiffs have sufficiently alleged that the product labels contained material misrepresentations. Plaintiffs allege that consumers are "increasingly concerned" about the effects of synthetic chemicals, pay a premium for natural products, and that, as a result, the nationwide market for "natural" products exceeds $100 billion dollars. (FAC ¶ 9.) In light of these concerns, plaintiffs allege that the representation that the products contain only natural ingredients is "material to a reasonable consumer." (*Id.* ¶ 14, 64 Cal.Rptr.2d 843, 938 P.2d 903.) Those allegations are sufficient to invoke a presumption of reliance.[FN4] *See In re Tobacco II Cases,* 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20; *see also, e.g., Bruton v. Gerber Prods. Co.,* 961 F.Supp.2d 1062, 1089 (N.D.Cal.2013) (holding that

plaintiff sufficiently alleged that defendant's health claims and nutrient content claims were material based on allegations about consumer behavior and consumers' understanding of product labels).

> FN4. The presumption of reliance is not merely an evidentiary presumption. In fact, courts routinely apply the presumption of reliance at the pleading stage to determine whether a plaintiff has standing under the UCL. *See, e.g., Chapman,* 220 Cal.App.4th at 229, 162 Cal.Rptr.3d 864; *Plascencia v. Lending 1st Mortg.,* 259 F.R.D. 437, 448–49 (N.D.Cal.2009) ("Just as the materiality of the interest rate and negative amortization terms permits a presumption of reliance in connection with the fraud claim, it also permits a presumption of reliance for the purposes of Proposition 64 standing.").

**\*4** Accordingly, because plaintiffs have sufficiently alleged economic injury and reliance, they have standing to bring this action under California's consumer protection statutes, *see Kwikset,* 51 Cal.4th at 322, 120 Cal.Rptr.3d 741, 246 P.3d 877, as well as Article III, *see Clapper,* 133 S.Ct. at 1147.

B. *Radiant Volume Conditioner Claims*

In the Ninth Circuit, there is "no controlling authority" on whether a plaintiff in a class action has standing to assert claims based on products he did not purchase. *Miller v. Ghirardelli Chocolate Co.,* 912 F.Supp.2d 861, 868 (N.D.Cal.2012). However, "[t]he majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." *Id.* at 869; *accord Wilson v. Frito–Lay N. Am., Inc.,* 961 F.Supp.2d 1134, 1140–41 (N.D.Cal.2013). "Factors that ... courts have considered include whether the challenged products are of the same kind, whether they are comprised of largely

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

the same ingredients, and whether each of the challenged products bears the same alleged mislabeling." *Id.* at 1141.

Although plaintiffs allege that they purchased five other products from the TRESemmé Naturals line, neither plaintiff alleges that she purchased defendant's Radiant Volume conditioner. (*See* FAC ¶¶ 6–7.) However, the packaging of the Radiant Volume conditioner is strikingly similar to the five products that plaintiffs purchased: it contains the same "Naturals" label and prominent green leaf as the other five products and makes the same claim of "silicone free conditioning" as the two conditioners that plaintiffs purchased. (*Id.* ¶ 11.) Plaintiffs have therefore alleged that the mislabeling of the Radiant Volume conditioner misled other purchasers in the same way that the mislabeling of defendant's other five products misled them. *See, e.g., Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 378 (N.D.Cal.2010) (holding that, "[a]lthough plaintiff did not purchase each type of beverage carrying the misleading label, his claims are reasonably coextensive with those of absent class members").

Accordingly, because the Radiant Volume conditioner is "substantially similar" to products that plaintiffs purchased, *Miller,* 912 F.Supp.2d at 869, plaintiffs have standing to bring claims on behalf of putative class members alleging that the Radiant Volume conditioner was mislabeled.

C. *Claims Based On Other States' Consumer Protection Laws*

In a class action, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 347, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "At least one named plaintiff must have standing with respect to each claim the class representatives seek to bring." *In re Ditropan XL*

*Antitrust Litig.,* 529 F.Supp.2d 1098, 1107 (N.D.Cal.2007). Therefore, when "a representative plaintiff is lacking for a particular state, all claims based on *that* state's laws are subject to dismissal." *In re Flash Memory Antitrust Litig.,* 643 F.Supp.2d 1133, 1164 (N.D.Cal.2009) (citing *Ditropan,* 529 F.Supp.2d at 1106–07) (alteration in original).

**\*5** Here, although Morales only alleges that she purchased TRESemme Naturals products in California, (*see* FAC ¶ 6), she asserts claims under the consumer protection laws of twenty-one different states, (*see id.* ¶ 52). Likewise, although Cohen only alleges that she purchased TRESemme Naturals products in Massachusetts, (*see* FAC ¶ 7), she asserts claims under the consumer protection laws of those states, (*see id.* ¶ 60). Because neither Morales nor Cohen is a resident of any state other than California or Massachusetts, respectively, and did not purchase defendant's products in any state but her own, plaintiffs do "not have standing to assert a claim under the consumer protection laws of the other states named in the Complaint." *Pardini v. Unilever U.S., Inc.,* 961 F.Supp.2d 1048, 1061 (N.D.Cal.2013); *see also, e.g., In re Apple & AT & TM Antitrust Litig.,* 596 F.Supp.2d 1288, 1309 (N.D.Cal.2008) ("Plaintiffs lack standing to bring consumer protection claims in the forty states where no named Plaintiff resides.").

Plaintiffs contend that the court should resolve this question at class certification, rather than on a motion to dismiss. However, the Ninth Circuit has emphasized that, with narrow exceptions not relevant here, a district court should "addresss[ ] the issue of standing before it addresse[s] the issue of class certification." [FN5] *Easter v. Am. W. Fin.,* 381 F.3d 948, 962 (9th Cir.2004); *see also Lee v. Oregon,* 107 F.3d 1382, 1390 (9th Cir.1997) ( "Standing is a jurisdictional element that must be satisfied prior to class certification." (citations and internal quotation marks omitted)). Because plaintiffs' lack of standing is "plain enough from the pleadings," it is an appropriate basis for dismissal even if it overlaps with issues typically

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

raised at class certification. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

> FN5. Plaintiffs rely principally on *In re Hydroxycut Marketing & Sales Practices Litig.,* 801 F.Supp.2d 993, 1004–05 (S.D.Cal.2011), as well as several district court decisions from the Second and Third Circuits, in support of the proposition that the court should determine plaintiffs' standing to bring class-wide claims at class certification rather than on a motion to dismiss. *Hydroxycut'* s suggestion that courts should defer questions of standing for class certification is inconsistent with controlling Ninth Circuit precedent. *See Easter,* 381 F.3d at 962. That suggestion is also at odds with *Hydroxycut'* s observation that "the issue of individual standing is separate and distinct from the inquiry of whether named plaintiffs can meet the requirements to certify a class under Rule 23." 801 F.Supp.2d at 1005.

Plaintiffs also argue that even if this question is appropriate for resolution on a motion to dismiss, plaintiffs have standing to bring claims on behalf of purchasers in other states so long as the consumer protection laws of those states are materially identical to the CLRA or the MCPA. This argument conflates the inquiry required under Rule 23 [FN6] with the inquiry into whether Morales has standing to assert those claims in the first instance. *See In re Genentech, Inc. Sec. Litig.,* Civ. No. 88–4038 DLJ, 1990 WL 120641, at *6 n. 4 (N.D.Cal. June 6, 1990) ("The requirements for individual standing represent a threshold inquiry that must be analyzed separate and apart from Rule 23. If the named plaintiffs for the proposed ... class in this action do not have standing, the necessary consequence is dismissal ... of the claim, not denial of class certification."

> FN6. Federal Rule of Civil Procedure 23

describes the requirements for class certification. *See* Fed.R.Civ.P. 23. "To be certified, the putative class and sub-classes must meet the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. Moreover, the proposed class must satisfy the requirements of Rule 23(b), which defines three different types of classes." *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 512 (9th Cir.2013) (citations omitted).

The cases that plaintiffs cite in support of this argument do not even discuss standing; rather, those cases address whether differences in state law undermine commonality, *see, e.g., In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Marketing Litig.,* 270 F.R.D. 521, 529 (N.D.Cal.2010), or predominance, *see, e.g., Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022–23 (9th Cir.1998). Plaintiffs have not cited, and the court cannot identify, any case holding that a plaintiff may assert class-wide claims that no named plaintiff has standing to bring. By contrast, numerous cases make clear that a plaintiff may not do so. *See, e.g., Ditropan,* 529 F.Supp.2d at 1107.

**\*6** Accordingly, because neither plaintiff has standing to sue under the laws of any state but her own, the court must grant defendant's motion to dismiss plaintiffs' claims on behalf of the Class to the extent they arise under the laws of states other than California and Massachusetts.

III. *Motion to Dismiss*

On a motion to dismiss under Rule 12(b)(6), the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). To survive a motion to dismiss, a plaintiff must plead

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

"only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This "plausibility standard," however, "asks for more than a sheer possibility that a defendant has acted unlawfully," and where a complaint pleads facts that are "merely consistent with a defendant's liability," it "stops short of the line between possibility and plausibility." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 557).

A. *Reasonable Consumer Test*

California's UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." *Cal. Bus. & Prof.Code § 17200; see Cel–Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (describing application of UCL). California's CRLA prohibits "unfair methods of competition and unfair or deceptive acts or practices." *Cal. Civ.Code § 1770; see Meyer,* 45 Cal.4th at 639, 88 Cal.Rptr.3d 859, 200 P.3d 295 (describing application of CLRA). "The standard for California's UCL, FAL, and CLRA is the 'reasonable consumer' test, which requires a plaintiff to show that members of the public are likely to be deceived by the business practice or advertising at issue." *Brazil,* 935 F.Supp.2d at 962–63 (N.D.Cal.2013) (citing *Williams v. Gerber Prods.,* 552 F.3d 934, 938 (9th Cir.2008)).

Massachusetts's MCPA prohibits "unfair method[s] of competition" or "unfair or deceptive acts or practices" when used "in the conduct of any trade or commerce." *Mass. Gen. Laws. ch. 93A § 11; see Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 55–56 (1st Cir.1998) (analyzing case law defining "unfair or deceptive acts or practices"). The MCPA likewise incorporates a "reasonable consumer" test. *See Aspinall v. Philip Morris Cos.,* 442 Mass. 381, 397, 813 N.E.2d 476 (2004) (holding that an advertisement is deceptive only "when it has the capacity ... to entice a reasonable consumer to purchase the product").

As a general rule, whether a business practice is likely to deceive a reasonable consumer is a "question of fact" that cannot be resolved on a motion to dismiss. *Williams,* 552 F.3d at 938; *see also, e.g., Von Koenig v. Snapple Beverage Corp.,* 713 F.Supp.2d 1066, 1079 (E.D.Cal.2010) (Damrell, J.); *Linear Tech. Corp. v. Applied Materials, Inc.,* 152 Cal.App.4th 115, 134–35, 61 Cal.Rptr.3d 221 (6th Dist.2007) (noting that this inquiry is a "question of fact which requires consideration and weighing of evidence from both sides"). Dismissal is appropriate only in the "rare situation" where "the advertisement itself made it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Williams,* 552 F.3d at 939.

**\*7** Here, plaintiffs allege that several aspects of the product labels are misleading: the use of the term "Naturals," the green leaf that is prominently displayed on the bottle, and the claims that the product is "silicone free" or "lower in sulfates." (FAC ¶ 11.) Plaintiffs allege that a reasonable consumer would take these representations to indicate that defendant's products are "natural" and free of "synthetic ingredients." (*Id.* ¶ 2.) Defendant argues that reasonable consumers would not be misled by those product labels because they understand that cosmetics are not natural-that "there are neither shampoo trees nor conditioner streams." (Def.'s Mem. at 12:2–3 (citing *Balser v. Hain Celestial Grp., Inc.,* Civ. No. 13–5604 R, 2013 WL 6673617, at *2 (C.D.Cal. Dec.18, 2013).) In support of this contention, defendant points to numerous FDA regulations referring to the "manufacture" of cosmetic products and argues that those regulations foreclose the possibility that cosmetics can be "natural." (*Id.* at 11–12 (citing 21 C.F.R. § 700.3(b)-(k)).)

Despite defendant's contention that a cosmetic product cannot be natural, numerous courts have denied motions to dismiss claims alleging that cosmetic

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

products were falsely labeled as "natural". *See, e.g.,*
*Brown v. Hain Celestial Grp.,* 913 F.Supp.2d 881, 898
(N.D.Cal.2012) (denying motion to dismiss when
defendant claimed that various cosmetic products
were "pure, natural, and organic"); *Fagan v. Neutro-*
*gena Corp.,* Civ. No. 5:13–1316 SVV OP, 2014 WL
92255, at *2 (C.D.Cal. Jan.8, 2014) (denying motion
to dismiss when defendant claimed that its sunscreen
was "100% naturally sourced"). Even if defendant
were correct that a cosmetic product cannot be "nat-
ural," it does not follow that labeling cosmetic prod-
ucts as natural is per se not misleading. Defendant's
argument leads to the opposite conclusion—namely,
that labeling cosmetic products manufactured from
artificial ingredients as "natural" *is* misleading.

Defendant then argues that the term "natural" is
not misleading because that term is "vague and am-
biguous" and "lacks an objective meaning." (Def.'s
Mem. at 11:1–8 (citing *Balser,* 2013 WL 6673617, at
*1).) Although the FDA has not defined the term
"natural" in the context of cosmetics labeling, *see*
*Astiana v. Hain Celestial Grp.,* 905 F.Supp.2d 1013,
1016 (N.D.Cal.2012), plaintiffs allege that their un-
derstanding of the term "natural" reflects the diction-
ary definition of the term-that is, that the products'
ingredients are "existing in or produced by nature" and
are "not artificial." (FAC ¶ 2 n. 1 (citing *Merri-*
*am–Webster                                Dictionary,*
www.merriam-webster.com/dictionary).)

Even if plaintiffs had not proffered an "objective
meaning" of the term "natural," they need not do so;
the relevant question is the meaning that consumers
would attach to the term. As many courts have ob-
served, this is generally not a question that can be
resolved on a motion to dismiss. *See, e.g., Brown,* 913
F.Supp.2d at 899; *Vicuna v. Alexia Foods, Inc.,* Civ.
No. 11–6119 PJH, 2012 WL 1497507, at *2 (N.D.Cal.
Apr.27, 2012) (holding that "the question whether a
reasonable consumer would likely be deceived by the
designation 'All Natural' is a factual dispute [that]
cannot be resolved" on a motion to dismiss); *Parker v.*

*J.M. Smucker Co.,* Civ. No. 13–690 SC, 2013 WL
4516156, at *6 (N.D.Cal. Aug.23, 2013) (holding that
the plaintiff's allegations that a reasonable consumer
would believe that a product labeled as "all natural"
contained no bioengineered or chemically altered
ingredients "cannot be resolved as a matter of law").
The court therefore cannot conclude at this stage of the
litigation that a reasonable consumer would not be
misled by the term "natural" or "Naturals." [FN7]

> FN7. Defendant argues that even if the term
> "natural" may be misleading, the term
> "TRESemmé Naturals" is not. This argument
> is meritless. The term "Naturals" is a deriva-
> tive of "natural" and plaintiffs allege that it
> connotes the same meaning—namely, that
> the products are free of synthetic ingredients.
> (FAC ¶ 2.) Courts have specifically held that
> a defendant cannot insulate itself from lia-
> bility for a misleading term by adding an "s"
> to the end of it. *See, e.g., Brown,* 913
> F.Supp.2d at 898 (denying motion to dismiss
> a claim alleging that the "Avalon Organics"
> brand name was misleading).

> To the extent that defendant claims the
> term "Naturals" cannot be misleading be-
> cause it is part of a brand name, that ar-
> gument is also incorrect. *See, e.g., id.*
> (holding that the "Avalon Organics" brand
> name could mislead reasonable consumers
> because it "could reasonably be interpreted
> to mean that the product is being sold as
> organic or that it otherwise meets a com-
> positional standard for the term 'organic'
> "); *Bronco Wine Co. v. Jolly,* 129
> Cal.App.4th 988, 1006, 29 Cal.Rptr.3d 462
> (3d Dist.2005) (holding that geographic
> brand names containing the term "Napa"
> may be "inherently misleading" to the ex-
> tent they are "suggestive of a false or
> misleading source of the grapes used in
> making the wine").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

**\*8** Finally, defendant argues that its labels were not misleading because the label on the back of each bottle accurately lists the ingredients contained in the product. (Def.'s Mem. at 8–9.) The Ninth Circuit has explicitly foreclosed the use of this argument:

> We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.

*Williams,* 552 F.3d at 939–40; *see also Lam v. Gen. Mills, Inc.,* 859 F.Supp.2d 1097, 1105 (N.D.Cal.2012) (citing *Williams* and holding that the "ingredients list cannot be used to correct the message that reasonable consumers may take from the rest of the packaging").

To the extent that the cases defendant cites suggest otherwise, those cases are either inconsistent with *Williams* or are distinguishable because the ingredient list merely confirmed the representation on the front of the package. *See, e.g., Viggiano v. Hansen Natural Corp.,* 944 F.Supp.2d 877, 892 (C.D.Cal.2013) (holding that soda labels advertising "all natural flavors" were not misleading where the "natural fruit from which the characterizing flavor is derived is listed on the statement of ingredients"). Here, by contrast, plaintiffs allege that defendant's product labels and use of the term "Naturals" were misleading because the products contain chemicals and other synthetic ingredients. Even if defendant disclosed those ingredients on the back label, it is settled law that it may not "rely on the ingredient list" to correct misleading labels. *Williams,* 552 F.3d at 939. Accordingly, because plaintiffs have adequately alleged that defendant's labels were likely to mislead a rea-

sonable consumer, *see id.* at 938, the court must deny defendant's motion to dismiss plaintiffs' UCL, CLRA, and MCPA claims.

*B. Rule 9(b)*

Although none of the consumer protection statutes at issue in this action require a showing of fraud, a plaintiff bringing a claim under these statutes must satisfy Federal Rule of Civil Procedure 9(b) if her claim alleges a course of fraudulent conduct.[FN8] *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009); *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103–04 (9th Cir.2003). Rule 9(b) requires a plaintiff whose claim "sounds in fraud" to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Under Rule 9(b), "[a]verments of fraud must be accompanied by the 'who, what, where, when, and how' of the misconduct charged." *Vess,* 317 F.3d at 1106 (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997)). In addition to identifying the particulars of the alleged fraud, Rule 9(b) requires that a plaintiff "must 'set forth what is false or misleading about a statement, and why it is false.' " *Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1161 (9th Cir.2009) (quoting *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir.1999)).

> FN8. The Ninth Circuit has emphasized that Rule 9(b) apply to state-law claims brought in federal court. *Vess,* 317 F.3d at 1102. Rule 9(b) specifically applies to claims brought under the UCL and CLRA, *see Kearns,* 567 F.3d at 1125, and the MCPA, *see First Choice Armor & Equip. Co. v. Toyobo Am., Inc.,* 717 F.Supp.2d 156, 163 (D.Mass.2010).

**\*9** "In a deceptive advertising case, Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional materials; allege when the plaintiff(s) were exposed to the materials; and explain how such materials were false or misleading." *Janney v. Mills,* 944 F.Supp.2d 806, 818 (N.D.Cal.2013). Here, plaintiffs provide a copy of each of the allegedly

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

misleading product labels and identify several features that they contend are misleading: the term "naturals," the use of a green leaf, and the claim that the product is "silicone free" or contains "lower sulfates." (FAC ¶ 11.) Plaintiffs also identify the locations of the stores where they purchased defendant's products after viewing the product labels and the dates on which they made those purchases. (*Id.* ¶¶ 6–7.) Finally, plaintiffs allege that the product labels are misleading because each product contains three to twelve artificial and unnatural ingredients, all of which are identified in the Complaint. (*Id.* ¶¶ 2, 16.)

District courts in California have found that similar allegations are sufficient to satisfy Rule 9(b). For instance, one court held that plaintiffs who provided labels from cooking oils marketed as "100% natural," that they viewed those labels throughout the class period, and that the labels were false because the oils were made from genetically modified crops satisfied Rule 9(b), even though plaintiffs failed to specify the specific dates on which they viewed the product labels. *In re ConAgra Foods Inc., 908 F.Supp.2d 1090, 1100–01 (C.D.Cal.2010).* Another judge in this district held that a plaintiff who submitted copies of Snapple labels containing the term "all natural" and alleged that the labels were false because Snapple contained high-fructose corn syrup satisfied Rule 9(b). *Von Koenig, 713 F.Supp.2d at 1077.* Plaintiff's allegations are at least as detailed as the allegations in *ConAgra* and *Von Koenig* and are therefore sufficient to satisfy Rule 9(b). *See Janney, 944 F.Supp.2d at 818.*

Defendant contends that even if plaintiffs have described the alleged misrepresentations with adequate specificity, they have not satisfied Rule 9(b) because they have not adequately alleged reliance. As a preliminary matter, it is not clear whether allegations of reliance are subject to Rule 9(b)'s heightened pleading requirement. *Compare Andrews Farms v. Calcot, Ltd., 527 F.Supp.2d 1239, 1252 (E.D.Cal.2007)* (O'Neill, J.) (holding that Rule 9(b) does not "require[ ] more particular pleading for the

element of reliance"), *and Anthony v. Yahoo Inc., 421 F.Supp.2d 1257, 1264 (N.D.Cal.2006)* (holding that the "heightened standards" of Rule 9(b) do not apply to allegations of reliance), *with Kane v. Chobani, Inc., ——F.Supp.2d ——, Civ. No. 12–2425 LHK, 2014 WL 657300, at *10 (N.D.Cal. Feb.20, 2014)* (holding that the plaintiffs' allegations of reliance "fail[ ] to meet the heightened pleading requirement under Rule 9(b)"), *and In re Countrywide Fin. Corp. Sec. Litig., 588 F.Supp.2d 1132, 1198 (C.D.Cal.2008)* (holding that "[t]he reliance element is subject to the pleading requirements of Rule 9(b) because it is one of the 'circumstances constituting fraud' ").

**\*10** The court need not resolve this question, however, because plaintiffs have adequately pled reliance even under Rule 9(b). Plaintiffs allege that they understood the product labels to mean that the products were free of artificial or unnatural ingredients and that they paid a premium for those products as a result. Those allegations are sufficiently particular to satisfy Rule 9(b). *See, e.g., ConAgra, 908 F.Supp.2d at 1100–1101* (holding that the plaintiffs satisfied Rule 9(b) when they "alleged that the phrase '100% natural' meant that Wesson Oil was not made from genetically modified organisms, and that they purchased the product based on this understanding"); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Prods. Liability Litig., 754 F.Supp.2d 1145, 1172 n. 18 (C.D.Cal.2010)* ("Allegations of representations from product labels and statements that, had consumers not been deceived by the labels, they would not have purchased the product, are sufficient to plead under Rule 9(b)."); *Werdebaugh v. Blue Diamond Growers, Civ. No. 12–2724 LHK, 2013 WL 5487236, at *14 (N.D.Cal. Oct.2, 2013)* (holding that a plaintiff sufficiently alleges reliance under Rule 9(b) when she states "why a reasonable consumer would be misled" by allegedly misleading food labels).

Accordingly, because plaintiffs have alleged the "circumstances constituting fraud" with sufficient

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1389613 (E.D.Cal.)
**(Cite as: 2014 WL 1389613 (E.D.Cal.))**

particularity, *see* Fed.R.Civ.P. 9(b), the court must deny defendant's motion to dismiss on this basis.

IT IS THEREFORE ORDERED that defendant's motion to dismiss be, and the same hereby is, GRANTED with respect to plaintiffs' claims on behalf of similarly situated purchasers to the extent that they arise under the laws of states other than California and Massachusetts, and DENIED in all other respects.

Plaintiffs have twenty days from the day this Order is signed to file an amended Complaint, if they can do so consistent with this Order.

E.D.Cal.,2014.
Morales v. Unilever U.S., Inc.
Slip Copy, 2014 WL 1389613 (E.D.Cal.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.