UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CLARIZIA, *et al.*, individually and on behalf of all others similarly situated, | : ECF Case :<br>: No. 13 Civ. 2907 (ALC) |
| Plaintiffs, | : |
| vs. | : |
| OCWEN FINANCIAL CORPORATION, *et al.*, | : |
| Defendants. | : |

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS ASSURANT, INC. AND AMERICAN SECURITY INSURANCE COMPANY

SULLIVAN & WORCESTER LLP
1633 Broadway
32nd Floor
New York, New York 10019
(212) 660-3000

CARLTON FIELDS JORDEN BURT, P.A.
1025 Thomas Jefferson Street NW
Suite 400 East
Washington, DC 20007
(202) 965-8100

*Attorneys for Defendants Assurant, Inc., and American Security Insurance Company*

Dated: New York, New York
       February 20, 2015

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

THE COMPLAINT'S ALLEGATIONS .................................................................................. 2

ARGUMENT .............................................................................................................................. 4

    I.    Only The Ervings Have Litigable Claims Against The Assurant Defendants .................................................................................................................. 4

    II.    The Ervings Fail To State A RICO Claim ............................................................... 5

    III.    The Ervings Fail To State A Claim For Unjust Enrichment .................................... 5

        A.    Flood Insurance – "Backdating" ................................................................ 6

        B.    Flood Insurance – "Overinsurance" ........................................................... 7

    IV.    The Ervings Fail To State An Aiding And Abetting Claim .................................. 10

CONCLUSION ......................................................................................................................... 11

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                                             **Page(s)**

*Brown v. Protective Life Insurance Co.*, 353 F.3d 405 (5th Cir. 2003)..........................................5

*Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025 (N.D. Cal. 2013) ............................8, 9

*Cannon v. Wells Fargo Bank, N.A.*, 2013 WL 3388222 (N.D. Cal. July 5, 2013) ......................6, 7

*Degutis v. Financial Freedom, LLC*, 978 F. Supp. 2d 1243 (M.D. Fla. 2013)...........................6, 9

*Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014).................................................9, 10

*Gooden v. Suntrust Mortgage, Inc.*, 2013 WL 5519983 (E.D. Cal. Oct. 3, 2013) .........................8

*Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432 (1st Cir. 2013).......................................9

*LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602 (D. Minn. June 20, 2012) ..............................8, 10

*Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 309441 (S.D. Fla. Jan. 23, 2015)..........................5

*Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 178220 (S.D. Fla. Jan. 13, 2015) .........................5

*Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542 (S.D.N.Y. 2014).......................................7

*In re Persico*, 522 F.2d 41 (2d Cir. 1975)........................................................................................7

*Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994) ...................................................................7

*Transcontinental & Western Air, Inc. v. Civil Aeronautics Board*, 336 U.S. 601 (1949) ...............7

*United States v. Enmons*, 410 U.S. 396 (1973)...............................................................................7

**Statutes and Regulations**

42 U.S.C. § 4012a.........................................................................................................................6, 8

24 C.F.R. § 203.16a..........................................................................................................................9

**Miscellaneous**

H.R. Rep. No. 112-102 (2011).........................................................................................................6

Julia Patterson Forrester, *Fannie Mae/Freddie Mac Uniform Mortgage Instruments:
    The Forgotten Benefit to Homeowners*, 72 Mo. L. Rev. 1077 (2007) ..................................8

Loans in Areas Having Special Flood Hazards; Interagency Questions and
    Answers Regarding Flood Insurance, 74 Fed. Reg. 35,914 (July 21, 2009).........................8

Brief for the United States as *Amicus Curiae* Supporting Appellees,
    *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098
    (11th Cir. May 10, 2013) (No. 13-10230)..............................................................................10

Brief for the United States as *Amicus Curiae* Supporting Appellees,
    *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432
    (1st Cir. Dec. 21, 2012) (No. 11-2030) ................................................................................10

Office of the Comptroller of the Currency, "Answers About Flood Insurance"
    (last visited Feb. 19, 2015), *at* http://www.helpwithmybank.gov/get-answers/insurance/flood-insurance/faq-flood-insurance-18.html ..........................................9

**PRELIMINARY STATEMENT**

In this putative class action, three named plaintiffs allege that they were overcharged for flood insurance required by the terms of their mortgages and placed by the defendant mortgage loan servicers. Under program agreements with the servicers, this lender-placed insurance ("LPI") was automatically issued by defendant American Security Insurance Company ("ASIC") when plaintiffs failed to maintain adequate, continuous coverage with carriers of their own choosing, as the mortgage required. The LPI protected plaintiffs' otherwise uninsured properties from potentially catastrophic loss.

In their Second Amended Class Action Complaint ("Complaint"), plaintiffs do not contest the LPI placements' necessity, but allege that so-called "kickbacks" in the form of "fees, commissions, rebates, and/or other forms of consideration" were paid in connection with the LPI – even though neither the mortgages nor any applicable law prohibits such payments. The Complaint alleges further that the LPI was "backdated" to cover periods for which there was no risk of loss – ignoring the requirement in each mortgage that the collateral property be continuously insured and that the property was, in fact, covered by the LPI from the moment each plaintiff's prior coverage lapsed. And the Complaint alleges that defendants "overinsured" the Ervings' property by purchasing LPI with coverage limits exceeding the lesser of their loans' unpaid balance, the "maximum" insurance coverage available through the National Flood Insurance Program ("NFIP"), or the property's replacement cost – notwithstanding that neither the Ervings' mortgage nor the unspecified "federal regulations" they invoke so restrict the amount of coverage a lender may place.

Due primarily to the pendency of a class action settlement and antisuit injunction in another District, however, the Complaint asserts claims against the two "Assurant Defendants" –

Assurant, Inc. and ASIC – litigable by only two of the three plaintiffs, Frances and Johnnie Erving. The other plaintiff, John Clarizia, is enjoined from litigating his claims. The Ervings assert claims against the Assurant Defendants for unjust enrichment, aiding and abetting breach of fiduciary duty, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

For the reasons explained more fully in the Assurant Defendants' motion to dismiss the Ervings' companion *hazard* LPI case in this District, *Lyons v. Litton Loan Servicing, LP*, No. 13 Civ. 513 (ALC), each of these claims should be dismissed, with prejudice. That motion ("the Assurant Defendants' *Lyons* Motion") is filed concurrently with this motion to dismiss. The Second Amended Class Action Complaint in *Lyons* is materially identical to the Complaint here. Accordingly, rather than repeat the multiple reasons for dismissal, this motion adopts and incorporates by reference the Assurant Defendants' *Lyons* Motion in its entirety and highlights additional reasons particular to *flood* LPI that the claims fail. Namely, with respect to the Ervings' "backdating" theory, a 2013 clarifying amendment to the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.*, codified the longstanding practice that a lender may place and charge for flood LPI beginning on the date on which the borrower's own coverage lapsed or did not provide a sufficient coverage amount. With respect to the Ervings' "overinsurance" theory, the courts and the United States government (acting as *amicus curiae*) have roundly rejected the notion that the operative mortgage language or any federal regulations restrict a lender's coverage limits in the way the Ervings suggest.

## THE COMPLAINT'S ALLEGATIONS

The Ervings, Florida residents, Compl. ¶ 34, are borrowers of a mortgage loan formerly serviced by the Saxon Defendants. The mortgage instrument requires the Ervings to maintain

2

hazard insurance on the collateral property "in the amounts" and "for the periods that Lender requires." Compl. Ex. 4 § 5. The mortgage provides that if the Ervings breach their contractual obligation to maintain adequate, continuous hazard insurance,

> Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 will become additional debt of Borrower secured by this Security Instrument.

*Id.* Further, if the Ervings fail "to perform the covenants and agreements contained in this Security Instrument," then "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument," including "protecting and/or assessing the value of the Property," *id.* § 9.

In October 2010, the Ervings received a letter stating that the flood LPI previously purchased by the Saxon Defendants covering the Ervings' property would expire and that the Saxon Defendants would renew this coverage unless provided with evidence of flood insurance. Compl. Ex. 7. The letter described the LPI's limits on the coverage afforded and advised the Ervings that the "premium charged for this insurance coverage could be substantially greater than that charged though a standard insurance provider." *Id.* The October 2010 letter continued: "We encourage you to obtain flood coverage from your insurance agent." *Id.*

Despite these exhortations, the Ervings did not obtain voluntary flood insurance, so the Saxon Defendants renewed ASIC-issued LPI coverage on the property for the period between November 1, 2010 and November 1, 2011. Compl. Ex. 8. In placing this LPI, the Saxon Defendants sent the Ervings yet another letter in November 2010 explaining the LPI's limited coverage and advising that "the cost may be much higher than the amount you would pay

3

through the Federal Flood Insurance Program." *Id.*  Like the October 2010 letter, the November 2010 letter advised the Ervings of their "right to purchase flood insurance from the company of your choice" and again encouraged them to do so. *Id.*

This process repeated itself the next year when, in November 2011, the Ervings received another letter renewing the ASIC-issued LPI coverage for the period between November 1, 2011 and November 1, 2012.  Compl. Ex. 9.  Once again, the Saxon Defendants candidly explained that the LPI could be a poor deal for them and reminded them that they could – *and should* – obtain their own coverage from the company of their choice.  *Id.*

For each renewal, the Saxon Defendants paid ASIC premiums and separately charged the Ervings' escrow account for the cost of the insurance.  Compl. ¶ 86.  The Complaint nowhere alleges that the Assurant Defendants themselves collected any money from the Ervings.

## ARGUMENT

### I. Only The Ervings Have Litigable Claims Against The Assurant Defendants.

The operative Complaint names three plaintiffs, Frances Erving, Johnnie Erving, and John Clarizia.  As explained in the Assurant Defendants' *Lyons* Motion, these plaintiffs also are named plaintiffs in a proposed class action in the United States District Court for the Southern District of Florida, *Lee v. Ocwen Loan Servicing, LLC*, No. 14 Civ. 60649, that has been preliminarily approved for class settlement.  When finally approved, paragraph 10.1 of the *Lee* settlement agreement will fully release the claims against the Assurant Defendants asserted by Mr. Clarizia, whose LPI was purchased by Ocwen Loan Servicing, LLC.  *See* Compl. ¶¶ 84-88.  Indeed, one condition of the *Lee* settlement (stated in paragraph 3.6) is the dismissal from this suit of "the Assurant Defendants with respect to lender placed insurance purchased by Ocwen."  In the interim, Mr. Clarizia is preliminarily enjoined from "prosecuting, intervening in, or

participating in (as class members or otherwise), any lawsuit in any jurisdiction for the Released Claims." *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 178220, at *8 (S.D. Fla. Jan. 13, 2015), *report and recommendations adopted*, 2015 WL 309441 (S.D. Fla. Jan. 23, 2015).

The Ervings' claims involving the Saxon Defendants' purchase and placement of ASIC-issued LPI may survive the *Lee* settlement and release. Their other claims involving the Ocwen Defendants' LPI placements *are* enjoined and will be released. Accordingly, the Assurant Defendants will address only the Ervings' (possibly) litigable claims at this time.

## II.  The Ervings Fail To State A RICO Claim.

As explained in the Assurant Defendants' *Lyons* Motion, the Ervings fail to state a claim for violations of RICO, including because:

- No RICO enterprise is plausibly alleged. The Complaint does not describe the alleged enterprise's membership, its structure, or how it is distinct from the supposed pattern of racketeering activity.

- The Complaint alleges only that the Assurant Defendants conducted their own affairs, not those of a purported RICO enterprise.

- No pattern of racketeering activity is plausibly alleged, as the Ervings do not plead actionable mail or wire frauds or transfers of stolen property. In fact, the Complaint does not allege that the so-called "Saxon Force-Placed Insurance Enterprise" placed LPI that, *even in the aggregate*, exceeded the value of $5,000 to qualify as a predicate violation of 18 U.S.C. § 2314. *See* Compl. ¶¶ 82 (charge of $2,053.75) & 84 (charge of $2,037.82). These amounts – or amounts charged to unnamed class members – cannot be aggregated anyway. *See Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 408 (5th Cir. 2003).

- The Ervings lack statutory standing to sue the Assurant Defendants. They fail to plausibly allege that a RICO violation was the proximate or "but for" cause of any injury.

- Because they have not alleged a substantive RICO violation, the Ervings fail to state a claim for RICO conspiracy.

## III.  The Ervings Fail To State A Claim For Unjust Enrichment.

As explained in the Assurant Defendants' *Lyons* Motion, the Ervings fail to state a claim for unjust enrichment, including because:

- The claim is predicated on defendants' alleged wrongful conduct, not unjust enrichment.

- The Assurant Defendants received a benefit from the Saxon Defendants, not the Ervings.
- The Ervings' written contracts preclude their unjust enrichment claim.
- There is nothing "unjust" about defendants' alleged conduct. The Ervings' "kickback" and "backdating" allegations are implausible.

### A. Flood Insurance – "Backdating"

The "backdating" theory is especially implausible in the context of flood LPI. Federal law requires borrowers like the Ervings to maintain continuous flood insurance. *See* 42 U.S.C. § 4012a(b)(1)(A). As amended effective in 2013, the National Flood Insurance Act explicitly provides that if a borrower fails to maintain required flood insurance, the lender may place its own and "charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance, *including premiums or fees incurred for coverage beginning on the date on which flood insurance coverage lapsed or did not provide a sufficient coverage amount*." 42 U.S.C. § 4012a(e)(2) (emphasis added); *see also Degutis v. Fin. Freedom, LLC*, 978 F. Supp. 2d 1243, 1263 n.10 (M.D. Fla. 2013) ("Lenders are also permitted by the regulations to backdate the insurance pursuant to 42 U.S.C. § 4012a(e)(2)").

The House Report accompanying a prior (unenacted) bill – which was the source of the emphasized language now appearing in the Act – explains that this language codifies "longstanding practices" and clarifies, rather than changes, existing law. *See* H.R. Rep. No. 112-102, at 39 (2011). "Thus, the House Report for the prior bill is relevant to determining Congress's intent in enacting § 4012a(e)(2)." *Cannon v. Wells Fargo Bank, N.A.*, 2013 WL 3388222, at *7 (N.D. Cal. July 5, 2013). Put simply, the National Flood Insurance Act *always* authorized servicers to require and place continuous flood coverage, *viz.*, so-called "backdating."

*See id.* at *4-7 (cited with approval on this point in *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 555 (S.D.N.Y. 2014)).[1]

### B. Flood Insurance – "Overinsurance"

The Ervings also introduce the notion that the LPI placements were unjust because

> the amount of force-placed insurance coverage was *greater* than the amount of hazard insurance Saxon separately force-placed on the Erving Property, despite federal regulations requiring that flood insurance coverage only be equal to the *lesser* of: (1) the maximum insurance coverage available through the NFIP, which is $250,000 per unit; (2) the outstanding balance of the loan; or (3) the replacement cost of the property.

Compl. ¶ 83. Thus, for example, if a borrower's loan balance is $100,000, but the cost to replace the home after a flood is $200,000, then the Ervings' theory is that the lender cannot require a borrower to replace the home. Instead, they say, the lender's insurance is limited to the amount of the loan's unpaid balance. But this "overinsurance" theory has enjoyed little success in the courts. That lack of success is unsurprising – neither the plain language of the Ervings' mortgage nor any "federal regulation" supports their theory.

The mortgage, a Fannie Mae/Freddie Mac Uniform Instrument, provides that the Ervings, as borrowers, must keep their property insured against loss by "any" hazard "for which Lender requires insurance," which insurance "shall be maintained *in the amounts*" and "for the periods

---

[1] Although the bill that the House Report accompanied (H.R. 1309) was not itself the bill enacted into law, "inquiry into meaning may not be limited to an examination of materials contemporary with a bill's passage." *In re Persico*, 522 F.2d 41, 64 (2d Cir. 1975). It is proper to consider the legislative history supplied by the House Report, which explicates the identical language that Congress ultimately *did* enact. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 306-09 (1994) (examining committee reports accompanying vetoed bill that contained language identical to language in a later-enacted statute); *United States v. Enmons*, 410 U.S. 396, 405 n.14 (1973) (remarks with respect to an unpassed bill "are wholly relevant to an understanding of the [passed] Act, since the operative language of the original bill was substantially carried forward" and "an interpretation placed by the sponsor of a bill on the very language subsequently enacted by Congress cannot be dismissed out of hand"); *Transcontinental & W. Air, Inc. v. Civ. Aeronautics Bd.*, 336 U.S. 601, 606 n.6 (1949) ("This [legislative] history is relevant to our problem, for though it relates to the 1937 bill which was not passed, the 'make effective' clause crystallized at that time and appeared in the 1938 bill which was enacted.").

that Lender requires," which requirements "can change during the term of the Loan." Compl. Ex. 4 § 5 (emphasis added).[2] Once the Ervings breached their obligation to maintain adequate, continuous insurance, their lender was authorized to obtain replacement LPI coverage, "at Lender's option and Borrower's expense," and was "under no obligation to purchase any particular type *or amount* of coverage." *Id.* (emphasis added). LPI "might provide greater or lesser coverage than was previously in effect." *Id.* The mortgage contains no statement – *none* – that the Saxon Defendants must limit coverage to the loan's unpaid balance or otherwise. Multiple courts agree with this interpretation of identical mortgage language from the Uniform Instrument. *See, e.g., Gooden v. Suntrust Mortg., Inc.*, 2013 WL 5519983, at *3 (E.D. Cal. Oct. 3, 2013); *Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1041 (N.D. Cal. 2013); *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *3-4 & *6 (D. Minn. June 20, 2012).

Likewise, the unspecified "federal regulations" vaguely referenced in the Complaint do not help the Ervings. The six federal agencies charged with administering the National Flood Insurance Act are in accord: "Lenders are permitted to require *more* flood insurance coverage than required by the regulation." Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers Regarding Flood Insurance, 74 Fed. Reg. 35,914, 35,936 (July 21, 2009) (emphasis added). Under the Act, a loan secured by improved real property in a flood zone must be "covered for the term of the loan by flood insurance in an amount *at least equal to* the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less." 42 U.S.C. §

---

[2] The Ervings can hardly describe the Uniform Instrument's terms as oppressive. The Fannie Mae/Freddie Mac Uniform Instrument is the "consumer-friendly" product of drafting by consumer advocates, and features "exceptionally fair terms." *See* Julia Patterson Forrester, *Fannie Mae/Freddie Mac Uniform Mortgage Instruments: The Forgotten Benefit to Homeowners*, 72 Mo. L. Rev. 1077, 1083-87 (2007).

4012a(b)(1)(A) (emphasis added); *see also* 24 C.F.R. § 203.16a(c) (providing that "flood insurance must be maintained during such time as the mortgage is insured in an amount *at least equal to* either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less") (emphasis added).

The words "at least equal to" set a minimum requirement or floor, not a maximum amount or ceiling. The Office of the Comptroller of the Currency explains on its website:

> The *minimum* amount of flood insurance necessary to meet the Act's requirement is the lesser of:
> 
> - The outstanding principal balance of the loan(s), or
> - The maximum amount of insurance available under the National Flood Insurance Program (NFIP), which is the lesser of:
>   - The maximum limit available for the type of structure, or
>   - The insurable value of the structure.
> 
> For single-family and two-to-four family dwellings and other residential structures located in a participating community under the regular program, the maximum amount of flood insurance available is $250,000. For non-residential buildings, the maximum amount of flood insurance available is $500,000.
> 
> *Lenders, however, are permitted to require more flood insurance coverage than the minimum required by the Act.*

(Emphases added.)[3]

Under the applicable federal regulations, therefore, a lender may require flood insurance in an amount that exceeds the unpaid loan balance, including to the extent of the property's full replacement value. Many courts have so held. *See, e.g.*, *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1107 (11th Cir. 2014); *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 446 (1st Cir. 2013) (*en banc*); *Cannon*, 917 F. Supp. 2d at 1040; *Degutis*, 978 F. Supp. 2d at 1262;

---

[3] Office of the Comptroller of the Currency, "Answers About Flood Insurance" (last visited Feb. 19, 2015), *at* http://www.helpwithmybank.gov/get-answers/insurance/flood-insurance/faq-flood-insurance-18.html.

*LaCroix*, 2012 WL 2357602, at *6. And the United States government has agreed in two *amicus curiae* briefs. *See* Brief for the United States as *Amicus Curiae* Supporting Appellees at 2, 7-9, 24-28, *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. May 10, 2013) (No. 13-10230); Brief for the United States as *Amicus Curiae* Supporting Appellees at 1, 6-7, 19, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432 (1st Cir. Dec. 21, 2012) (No. 11-2030).

Consider the implications of the Ervings' contrary position. "If the insurance amount is limited to the unpaid principal balance, as opposed to the property's replacement value, the lender would not be able to insure against the risk the regulatory scheme imposes because the cost of repairing the damage may exceed the unpaid balance of the loan, which would result in the lender having to pay more for repair than it could collect in insurance benefits." *Feaz*, 745 F.3d at 1107. Moreover, "in any area outside the special-flood-hazard designation, the lender could not require the borrower to obtain any flood insurance at all. Yet homes in such areas may face significant flood risk." *Id.* at 1108. The Ervings' interpretation "would also prevent lenders from requiring adequate flood insurance for homes with mortgages above $250,000" and from "following the FEMA-recommended practice of adopting a sound flood insurance risk management approach by following the insurance industry practice of insuring buildings to full replacement cost value," as was done here. *Id.* (internal quotation marks omitted).

In short, there is nothing to support the Ervings' contrived theory of "overinsurance."

**IV. The Ervings Fail To State An Aiding And Abetting Claim.**

As explained in the Assurant Defendants' *Lyons* Motion, the Ervings fail to state a claim for aiding and abetting a breach of fiduciary duty because, on the facts alleged, Florida law does not recognize a fiduciary duty between the Ervings and the Saxon Defendants.

## CONCLUSION

For all the foregoing reasons, the Assurant Defendants respectfully move for an order dismissing the Ervings' (potentially) litigable claims, with prejudice, from the Complaint, and granting such other and further relief as may be just and equitable.

Dated:  New York, New York
February 20, 2015

SULLIVAN & WORCESTER LLP

By: */s/ Andrew T. Solomon*
Andrew T. Solomon (AS-9200)
1633 Broadway
32nd Floor
New York, New York 10019
(212) 660-3000

CARLTON FIELDS JORDEN BURT, P.A.
Frank G. Burt (*pro hac vice*)
W. Glenn Merten (*pro hac vice*)
Brian P. Perryman (*pro hac vice*)
1025 Thomas Jefferson Street NW
Suite 400 East
Washington, DC 20007
(202) 965-8100

*Attorneys for Defendants Assurant, Inc., and American Security Insurance Company*

100328724.1